IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-CV-271-D

| | | |
|---|---|---|
| HENRIETTA RENEE MASON, individually and as Administrator of the Estate of Tyrone Mason, | ) ) ) ) | |
| Plaintiff, | ) ) | ORDER |
| v. | ) ) | |
| GARRETT MACARIO, | ) ) | |
| Defendant. | ) | |

On May 21, 2025, Henrietta Renee Mason ("Mason" or "plaintiff"), individually and as the Administrator of the Estate of Tyrone Mason ("Decedent Mason"), sued Garrett Macario ("Macario" or "defendant") in his individual capacity [D.E. 1]. Mason asserts two claims under 42 U.S.C. § 1983: (1) a violation of Decedent Mason's substantive due process rights to life and bodily autonomy in violation of the Fourteenth Amendment and (2) failure to render aid in violation of the Fourteenth Amendment. See [D.E. 1] 6–10. On July 28, 2025, Macario (a former North Carolina State Highway Patrol trooper) moved to dismiss count one for failure to state a claim [D.E. 17] and filed a memorandum in support [D.E. 18]. On August 14, 2025, Mason responded in opposition [D.E. 20]. As explained below, the court dismisses count one because Mason does not plausibly allege facts sufficient to infer that Macario pursued Decedent Mason with the intent to harm him.

I.

At approximately 2:25 a.m. on October 7, 2024, Macario (then a North Carolina State Highway Patrol trooper) was parked at a Speedway gas station on Capital Boulevard in Raleigh,

North Carolina. See [D.E. 1] ¶ 7. Macario operated a red or orange unmarked State Patrol vehicle. See id. at ¶ 8. Around 2:28 a.m., Decedent Mason drove past the Speedway. See id. at ¶ 9. Macario exited the Speedway parking lot, engaged his lights and siren, and pursued Decedent Mason at a high rate of speed. See id. at ¶ 10. Once Macario turned on his lights and siren, Decedent Mason accelerated. See id. at ¶ 12. At approximately 2:29 a.m., after Macario pursued Decedent Mason for approximately one mile and less than one minute, Macario disengaged his lights and siren. See id. at ¶ 13. Macario then lost sight of Decedent Mason. See id. at ¶¶ 24–25.

As Decedent Mason and Macario continued on Capital Boulevard, they approached an area where Wake Forest Road passes over Capital Boulevard—an area with a concrete median and two overpasses with concrete pillars that run perpendicular to the road. See id. at ¶ 14. As Decedent Mason approached this area, he lost control of his vehicle, crossed the concrete median, and collided with a concrete pillar. See id. at ¶ 15. Around 2:30 a.m., Macario approached and saw the accident scene, reengaged his lights, and called for emergency services. See id. at ¶¶ 16–17. Macario parked his vehicle and approached Decedent Mason's car, shining his light on the vehicle and wreckage. See id. at ¶¶ 17–19. Macario did not check inside Decedent Mason's vehicle or attempt to check whether Decedent Mason was alive or injured. See id. at ¶ 20. Decedent Mason's time of death at the accident scene was later determined to be 2:40 a.m. See id. at ¶ 21.

After inspecting Decedent Mason's vehicle exterior, Macario called his supervisor, Trooper Matthew Morrison ("Morrison"). See id. at ¶ 22. Macario told Morrison that he pursued Decedent Mason because he intended to pull him over, but then he turned his lights off to stop the pursuit. See id. at ¶ 23. Macario explained that after turning off his lights, he came around the corner and saw that Decedent Mason had wrecked. See id. Morrison responded, "Please tell me you're fucking joking." Id. Morrison then asked Macario if he radioed dispatch during the pursuit.

2

See id. at ¶ 24. Macario told Morrison that he did not radio dispatch but turned off his siren and lights when he realized it was not a smart chase. See id. Macario reiterated that he lost sight of Decedent Mason and saw the wreckage and smoke when he came around the corner. See id. at ¶ 25. Morrison responded, "Sounds to me like it's RPD's [(Raleigh Police Department's)] problem." Id. Macario again expressed concern that his pursuit of Decedent Mason was not "a safe chase." Id. at ¶ 26. Morrison reassured Macario that it was RPD's problem and advised Macario not to tell RPD officers that he attempted to stop Decedent Mason. See id. at ¶ 27. Rather, Morrison told Macario to tell the officers that he "drove up on" the wreck. Id. Morrison then asked Macario if he had confirmed that Decedent Mason was "D.R.T.," meaning "dead right there." See id. at ¶ 28. Macario replied, "[Y]ea," even though Macario had not checked on Decedent Mason since arriving on scene. See id. Before hanging up, Morrison told Macario that he "wouldn't say shit" to RPD about the case and reminded Macario to just say he "drove up on" the wreck. Id. at ¶ 29.

After hanging up, Macario approached Decedent Mason's vehicle and inspected the exterior. See id. at ¶ 31. Macario did not check on Decedent Mason's condition. See id. At that time, RPD officers arrived on scene. See id. at ¶ 32. Macario approached the RPD officers and told them that he had "rolled up on" the accident, which he said was "fatal." Id. at ¶ 33. At 2:36 a.m., an RPD officer asked Macario if he checked on the driver, and Macario responded, "[N]ot yet, no." Id. at ¶ 34. Then a different RPD officer asked Macario if he was "pulling [Decedent Mason] over or something." Id. at ¶ 35. Macario replied "[N]o." Id. at ¶ 36. He explained, "[T]his is just the little area I work and I came up on it and I saw all the smoke and heard all the cars hitting the debris." Id.

3

Decedent Mason died at the accident scene from his injuries. See id. at ¶ 21. After the accident, plaintiff Mason—Decedent Mason's mother—was informed that Decedent Mason died in a car accident with no witnesses. See id. at ¶ 38. But Mason felt that there was more to the story. See id. She emailed government agencies, hired an attorney, and took her concerns about the circumstances of Decedent Mason's death to the Wake County District Attorney. See id. at ¶ 39. The North Carolina State Bureau of Investigation ("NCSBI") investigated Macario and Morrison. See id. at ¶ 40. NCSBI and the Wake County District Attorney reviewed the dash and body camera footage from the night of October 7, 2024, and discovered Macario's role in the accident and the subsequent cover-up. See id. at ¶ 41. After this discovery, Macario and Morrison were placed on administrative leave pending further investigation. See id. at ¶ 42. Subsequently, the North Carolina State Highway Patrol terminated their employment.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (cleaned up); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (citation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted

4

inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (citation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [her] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (citation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Mason asserts two claims against Macario in his individual capacity under 42 U.S.C. § 1983, which requires the court to analyze the doctrine of qualified immunity. See District of Columbia v. Wesby, 583 U.S. 48, 62 n.7 (2018); Camerata v. Greene, 563 U.S. 692, 707 (2011);

5

Pearson v. Callahan, 555 U.S. 223, 236 (2009); King v. Riley, 76 F.4th 259, 264–65 (4th Cir. 2023). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see City of Escondido v. Emmons, 586 U.S. 38, 42 (2019) (per curiam); Kisela v. Hughes, 584 U.S. 100, 103–04 (2018) (per curiam); Wesby, 583 U.S. at 63; Hernandez v. Mesa, 582 U.S. 548, 554 (2017) (per curiam); Ziglar v. Abbasi, 582 U.S. 120, 150–51 (2017); King, 76 F.4th at 266–68; Sharpe v. Winterville Police Dep't, 59 F.4th 674, 682–84 (4th Cir. 2023); Burns-Fisher v. Romero-Lehrer, 57 F.4th 421, 424 (4th Cir. 2023); Tobey v. Jones, 706 F.3d 379, 385 (4th Cir. 2013). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 584 U.S. at 104.

In analyzing qualified immunity, the court asks (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson, 555 U.S. at 232 (cleaned up); see Wood v. Moss, 572 U.S. 744, 757 (2014); Knibbs v. Momphard, 30 F.4th 200, 214 (4th Cir. 2022); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (cleaned up); see Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curiam); King, 76 F.4th at 265; Sharpe, 59 F.4th at 682–84. Although a case need not be directly controlling, "existing precedent must have

6

placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Rivas-Villegas, 595 U.S. at 5; King, 76 F.4th at 266–68; Sharpe, 59 F.4th at 682–84.

To determine whether an officer's conduct violates clearly established law, a court must first specifically define the right. See, e.g., City of Tahlequah v. Bond, 595 U.S. 9, 12–13 (2021) (per curiam). "Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. (cleaned up). Then, based on that specifically defined right, the court must determine whether existing precedent placed the statutory or constitutional question "beyond debate." Kisela, 584 U.S. at 104. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Bond, 595 U.S. at 12 (cleaned up); see Wesby, 583 U.S. at 63. An officer is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 584 U.S. at 104 (citation omitted); see Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam); Wesby, 583 U.S. at 63–66.

The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." Wesby, 583 U.S. at 66 n.8; see Kisela, 584 U.S. at 103–06; Taylor v. Barkes, 575 U.S. 822, 825–27 (2015) (per curiam); City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 613–14 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam). In the Fourth Circuit, "existing precedent" includes precedent of the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the highest court of the state in which the action arose. See Doe ex rel. Johnson, 597 F.3d at 176. It also includes "a consensus of persuasive authority from other jurisdictions." Sharpe, 59 F.4th at 683.

7

In Pearson, the Supreme Court held that the qualified-immunity analysis need not proceed in a particular sequence, and that "[t]he judges of the district courts and the courts of appeals [may] exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236; King, 76 F.4th at 265. Qualified immunity shields a defendant if the answer to either prong is "no." See al-Kidd, 563 U.S. at 735; Miller, 475 F.3d at 627; Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009).

### A.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; see Meachum v. Fano, 427 U.S. 215, 223 (1976). A substantive due process claim requires action "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (en banc) (citation omitted); see Desper v. Clarke, 1 F.4th 236, 248 (4th Cir. 2021). The culpability standard necessary to "shock the conscience" varies based on the circumstances. Once the culpability standard is established, the plaintiff must plausibly allege facts to permit a reasonable factfinder to infer that the culpability standard is met.

The parties dispute which culpability standard applies to Macario's alleged conduct. Mason argues the deliberate indifference standard applies because Macario allegedly admitted in his motion to dismiss that this was not a police chase, he did not radio dispatch, and he told RPD he was not pursuing or attempting to pull over Decedent Mason. See [D.E. 20] 7–8. Macario argues that the intent-to-harm standard applies because Decedent Mason sped past the Speedway and fled at a high rate of speed from Macario's attempted traffic stop. See [D.E. 18] 5–6.

8

"[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845–46 (1998) (cleaned up); see Daniels v. Williams, 474 U.S. 327, 331 (1986); Wolff v. McDonnell, 418 U.S. 539, 558 (1974). In other words, the Due Process Clause prevents "government officials from abusing their power, or employing it as an instrument of oppression." Lewis, 523 U.S. at 846 (cleaned up); see Collins v. Harker Heights, 503 U.S. 115, 126 (1992); DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989); Davidson v. Cannon, 474 U.S. 344, 348 (1986). For an executive official to abuse power, the executive official's conduct must "shock[] the conscience." Lewis, 523 U.S. at 846; see Whitley v. Albers, 475 U.S. 312, 327 (1986); Breithaupt v. Abram, 352 U.S. 432, 435 (1957); Rochin v. California, 342 U.S. 165, 172–73 (1952).

Courts must consider a "culpability spectrum" when determining whether conduct shocks the conscience. See Lewis, 523 U.S. at 848–51. On one end of the spectrum, negligence will never rise to the conscious-shocking level. See id. at 848–49. On the other end of the spectrum, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849; see Daniels, 474 U.S. at 331. "[C]loser calls" arise in the "middle range," when conduct amounts to "something more than negligence but less than intentional conduct." Lewis, 523 U.S. at 849 (cleaned up). The level of culpability in this "middle range" is "deliberate indifference," which may violate due process depending on the facts. See id. at 848–50; Dean v. McKinney, 976 F.3d 407, 415 (4th Cir. 2020). Determining "which of these standards of culpability—intent to harm or deliberate

indifference—applies requires an exact analysis of context and circumstances before any abuse of power is condemned as conscience shocking." Dean, 976 F.3d at 414 (cleaned up).

Lewis is the Supreme Court's seminal substantive due process case stemming from a police officer's conduct during a vehicle pursuit. In Lewis, two officers saw a motorcycle carrying two individuals speed past them while stopped at an unrelated emergency call. See 523 U.S. at 836. One officer activated his lights, yelled for the motorcycle to stop, and tried to block the motorcycle with his vehicle. See id. at 836–37. The motorcycle evaded the officer's vehicle and sped off. See id. at 837. The other officer then activated his lights and siren and "began pursuit at high speed." Id. The officer did not radio dispatch. See id. at 838. The pursuit lasted for 75 seconds and spanned 1.3 miles through a residential neighborhood. See id. at 837. At times, the motorcycle and patrol car reached 100 miles per hour. See id. The pursuit ended when the motorcycle tipped over, the passenger fell off the motorcycle, and the officer hit the passenger with his vehicle going 40 miles per hour. See id. The passenger died at the accident scene from his injuries. See id.

In determining which culpability standard applied to the officer's conduct, the Supreme Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment [that is] redressible by an action under § 1983." Id. at 854. The Supreme Court emphasized that police officers must "act decisively and [] show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." Id. at 853 (cleaned up); see Dean, 976 F.3d at 414. When deciding whether to engage in a high-speed chase, an officer must balance the need to stop a suspect with the threat that the high-speed chase poses. See Lewis, 523 U.S. at 853. Because the situation is "tense, uncertain, and rapidly evolving," the intent-to-harm standard applies. Id. (cleaned up); see Dean, 976 F.3d at 414. Courts have interpreted Lewis

10

broadly, applying the intent-to-harm standard when officers respond to any emergency call. See Dean, 976 F.3d at 415; see also Terrell v. Larson, 396 F.3d 975, 980 (8th Cir. 2005) (en banc); Radecki v. Barela, 146 F.3d 1227, 1230–32 (10th Cir. 1998).

"[W]hen an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions." Dean, 976 F.3d at 415. But courts must only apply deliberate indifference "when actual deliberation is practical." Lewis, 523 U.S. at 851. Thus, the court applies deliberate indifference if the police officer has the "luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." Id. at 853; see Dean, 976 F.3d at 415.

In Dean, the Fourth Circuit held that deliberate indifference was the appropriate culpability standard based on the non-emergency circumstances. There, a deputy radioed a Code 3, which represents an emergency response where human life or safety is at risk. See Dean, 976 F.3d at 411. McKinney, a deputy sheriff, activated his lights and sirens and headed to the location. See id. at 412. The deputy then cancelled the Code 3, and McKinney deactivated his lights and sirens and started to reduce his speed. See id. But about two minutes after the cancellation signal, McKinney was still traveling around 83 miles per hour. See id. McKinney then lost control of his patrol car and struck another vehicle. See id. The Fourth Circuit applied the deliberate indifference standard and observed that a jury could find that (1) McKinney was not responding to an emergency (because the Code 3 was cancelled), and (2) McKinney had time to deliberate his actions (two minutes and 15 seconds from the cancellation to the crash). See id. at 415–16.

Here, Mason argues that the deliberate indifference standard applies because Macario did not radio dispatch, did not provide a reason for the pursuit, and falsely told RPD that he never

11

pursued Decedent Mason or attempted to pull him over. But these facts speak to Macario's state of mind, not the proper standard to apply. For deliberate indifference to apply, the court must conclude that Macario had time to make an "unhurried judgment[]," with an opportunity for "repeated reflection, largely uncomplicated by the pulls of competing obligations." Lewis, 523 U.S. at 853; see Dean, 976 F.3d at 415. This inquiry requires the court to examine the totality of the circumstances.

At about 2:30 a.m., Macario was parked in his unmarked State Patrol vehicle at a Speedway gas station on Capital Boulevard when Decedent Mason drove past him. See [D.E. 1] ¶¶ 7, 9. Macario exited the Speedway, engaged his lights and siren, and pursued Decedent Mason at a high rate of speed in order to make a traffic stop. See id. at ¶ 10. Once Macario turned on his lights and siren, Decedent Mason accelerated. See id. at ¶ 12. Macario pursued Decedent Mason for approximately one mile before disengaging his lights and siren. See id. at ¶ 13. Macario then lost sight of Decedent Mason's vehicle. See id. at ¶¶ 24–25. As Decedent Mason continued on Capital Boulevard, he lost control of his vehicle, crossed the concrete median, and collided with a concrete pillar. See id. at ¶ 15. Decedent Mason died at the accident scene. See id. at ¶ 21.

When sitting at the Speedway, Macario had to make a split-second decision about whether to pursue and stop Decedent Mason. Similarly, once Decedent Mason accelerated, Macario had to balance the need to continue pursuit and stop Decedent Mason with the threat that pursuit posed. See Lewis, 523 U.S. at 853. The pursuit was "uncertain," "rapidly evolving," and ongoing as Decedent Mason continued to accelerate down Capital Boulevard, a highly traveled city road. See id. (cleaned up); cf. Dean, 976 F.3d at 415–16 (applying the deliberate indifference standard because the evolving, ongoing emergency was over). Macario had to make hurried judgments

12

with minimal reflection and competing obligations of lawfulness and safety. See Lewis, 523 U.S. at 853.

Macario's decision to stop the chase because he determined it was unsafe does not show that Macario had time to deliberate and make unhurried judgments at the outset. See [D.E. 1] ¶ 26 (telling Morrison he disengaged because it was not "a safe chase"). As the pursuit evolved, Macario continued to weigh the need to continue to pursue Decedent Mason at a high rate of speed with ongoing safety concerns, including that Decedent Mason continued to accelerate. Ultimately, Macario made a quick decision to stop pursuit. To apply deliberate indifference because Macario called off the pursuit would discourage officers from calling off chases mid-pursuit when safety concerns arise. Cf. Lewis, 523 U.S. at 853 (stating that deliberate indifference applies if the police officer has the "luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations").

The following facts here are identical to Lewis, where the Court applied the intent-to-harm standard to a police pursuit: Macario was parked before he began his pursuit. See id. at 836. Macario activated his lights and siren and pursued Decedent Mason. See id. at 836–37. Decedent Mason accelerated to unlawful speeds. See id. at 837. Macario did not radio dispatch. See id. at 838. The pursuit lasted less than two minutes and spanned approximately one mile. See id at 837. And Decedent Mason lost control of his vehicle, wrecked, and died from his injuries. See id. The pursuit took place "in haste, under pressure, and . . . without the luxury of a second chance." Id. at 852 (cleaned up). Thus, the intent-to-harm standard applies to Macario's actions. See id.

## B.

Macario argues that he did not intend to harm Decedent Mason. See [D.E. 18] 4–6. To avoid dismissal, Mason must plausibly allege facts sufficient to permit a reasonable factfinder to

13

infer that Macario intended to harm Decedent Mason physically or worsen Decedent Mason's legal plight. See Lewis, 523 U.S. at 854; Dean, 976 F.3d at 414.

Satisfying the intent-to-harm standard is difficult but not impossible. "[O]nly a purpose to cause harm unrelated to the legitimate object of arrest will satisfy" the intent-to-harm standard. Lewis, 523 U.S. at 834. Officers typically chase a suspect for a legitimate law enforcement purpose, and even when they do not, legitimate justifications are readily available. But the intent-to-harm standard turns on the officer's subjective intent. See Est. of Soakai v. Abdelaziz, 137 F.4th 969, 977 (9th Cir. 2025) ("[T]he purpose-to-harm test turns on the officer's subjective intent."); Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996) (describing the intent-to-harm standard applied to an Eighth Amendment claim as a subjective analysis, which the Supreme Court later extended to Fourteenth Amendment claims for unlawful police pursuits in Lewis), overruled on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam). Thus, rather than acting on an instinct to do his job, the officer must subjectively intend to "induce . . . lawlessness, or to terrorize, cause harm, or kill." Lewis, 523 U.S. at 855.

An officer is not liable under an intent-to-harm standard if the officer engages his lights and siren to conduct a traffic stop of a suspect, and the suspect flees and crashes during the officer's pursuit. As discussed, in Lewis, two officers, parked at an unrelated emergency call, saw a motorcycle carrying two individuals speed past them. See 523 U.S. at 836. One officer activated his lights, yelled for the motorcycle to stop, and tried to block the motorcycle with his vehicle. See id. at 836–37. The motorcycle evaded the vehicle and sped off. See id. at 837. The other officer then activated his lights and siren and "began pursuit at high speed." Id. The officer did not radio dispatch. See id. at 838. The pursuit, which reached speeds of 100 miles per hour, lasted for 75 seconds and spanned 1.3 miles through a residential neighborhood. See id. at 837. Ultimately,

14

the suspects' motorcycle tipped over, the passenger fell off, and the officer hit the passenger going 40 miles per hour. See id. The passenger died at the accident scene. See id.

The Court reasoned that the deputy was faced "with a course of lawless behavior for which the police were not to blame." Id. at 855. Specifically, the deputy "had done nothing to cause [the suspect's] high-speed driving in the first place, nothing to excuse [the suspect's] flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage [the suspect] to race through traffic." Id. Moreover, the officer's decision to continue the pursuit was not "tainted by an improper or malicious motive." Id. Thus, the Court held that the intent-to-harm standard was not satisfied. See id.

By contrast, an officer may be liable under the intent-to-harm standard if the officer is dressed in plainclothes and attempts to pull over a suspect in an unmarked car without engaging his lights and sirens and then plants evidence on the suspect. For example, in Johnson v. Baltimore Police Department, 452 F. Supp. 3d 283 (D. Md. 2020), two police officers in plainclothes maneuvered their unmarked police vehicles to "box in" an occupied vehicle "without observing any suspicious or ongoing criminal conduct." Id. at 292, 301. The officers drew their guns but did not announce themselves as officers or engage their lights or sirens. See id. at 292. The vehicle's two occupants believed they were being robbed and sped away. See id. The officers pursued, running stop signs at five different intersections, and never activated the vehicles' emergency equipment. See id. The chase ended when the fleeing vehicle crashed into another vehicle, killing its driver. See id.

After the crash, the pursuing officers called another officer and instructed him to bring illegal drugs to the scene. See id. The officers planted 32 grams of heroin in the occupants' vehicle to provide a lawful justification for the pursuit. See id. The officers also provided false statements

15

to the investigating officer and authored a false probable cause statement to support criminal charges against the occupants. See id. The district court denied the motion to dismiss, holding that these facts permitted a factfinder to plausibly infer that the officers were driven by "an improper or malicious motive," such as to "terrorize or cause harm." Id. at 301–02 (cleaned up).

Here, Macario argues that because the facts are identical to Lewis, the intent-to-harm standard is not met. The court agrees that the facts before the crash are materially indistinguishable from Lewis, providing a starting point for the court's analysis.

As in Lewis, Macario used his lights and siren to initiate a pursuit and traffic stop. Macario then briefly pursued Decedent Mason when he fled at a high rate of speed. See Lewis, 523 U.S. at 836–37 (referencing that the officer turned on his lights and siren and pursued the suspect for 1.3 miles). Because Macario used his emergency response signals, Decedent Mason knew Macario was a law enforcement officer but still fled at a high rate of speed. Cf. Johnson, 452 F. Supp. 3d at 292 (stating the suspects believed they were being robbed because the officers did not use lights or siren when they initially drew their weapons or during the subsequent chase). Furthermore, as in Lewis, Macario did not radio dispatch. Although Mason emphasizes this failure to radio dispatch, Macario's pursuit lasted less than 60 seconds, making that omission more understandable. See Lewis, 523 U.S. at 837–38 (explaining that the deputy did not radio dispatch during the the high-speed pursuit, which lasted 75 seconds over a court of 1.3 miles).

As in Lewis, Macario did "nothing to cause [Decedent Mason's] high-speed driving in the first place [and] nothing to excuse [Decedent Mason's] flouting of the commonly understood law enforcement authority to control traffic." Id. at 855. But unlike Lewis, Macario stopped his pursuit and lost sight of Decedent Mason before Decedent Mason crashed. Macario stopped the pursuit because it was not a "safe chase," thereby encouraging Decedent Mason to slow down. Cf. id.

16

(stating that the deputy in <u>Lewis</u> did "nothing (<u>beyond a refusal to call off the chase</u>) to encourage [the suspect] to race through traffic" (emphasis added)). If Macario intended to harm Decedent Mason, then Macario would not have stopped his pursuit out of concern for Decedent Mason's safety. Moreover, Macario pursued Decedent Mason on a major city road in the middle of the night with no one around—safer pursuit conditions than those in <u>Lewis</u>. <u>Cf. id.</u> at 836–37 (pursuing the suspect at 8:30 p.m. through residential neighborhood at speeds of up to 100 miles per hour until the suspect crashed his motorcycle, killing the passenger). Furthermore, Macario exercised more caution than the deputy in <u>Lewis</u>, stopping his pursuit after approximately one mile when he realized it was unsafe. Macario then lost sight of Decedent Mason. These facts would not permit a reasonable factfinder to infer that Macario chased Decedent Mason to "induce . . . lawlessness, or to terrorize, cause harm, or kill." <u>Id.</u> at 855.

In opposition, Mason argues that Macario's and Morrison's cover-up would permit a reasonable factfinder to infer that Macario chased Decedent Mason with an intent to harm Decedent Mason. Sometimes a factfinder can use subsequent conduct and statements to infer an individual's prior state of mind. <u>See</u> <u>A.W. Hawkins, Inc. v. United States</u>, 244 F.2d 854, 856 (4th Cir. 1957) ("It is, of course, proper to draw inferences as to intent from the circumstances under which an act was done and from subsequent conduct and statements, for that is usually the only way a state of mind can be proved; direct proof is seldom available."); <u>see also</u> <u>United States v. Hadaway</u>, 681 F.2d 214, 217 (4th Cir. 1982) ("[S]ubsequent conduct may be highly probative of prior intent."). But Macario's subsequent conduct and statements in this case would not permit a reasonable factfinder to infer that Macario intended to harm Decedent Mason when he pursued him and then stopped the pursuit.

After Macario reached Decedent Mason's wreck, Macario parked his vehicle and approached Decedent Mason's car. See [D.E. 1] at ¶¶ 17–18. Macario shined a light on the wreckage but did not attempt to check on Decedent Mason. See id. at ¶¶ 19–20. Macario then called Morrison, his supervisor. See id. at ¶ 22. Macario told Morrison that he pursued Decedent Mason because he intended to pull him over but then stopped the pursuit. See id. at ¶ 23. Macario explained that after he stopped pursuit, Macario came around the corner and saw the wreck. See id. Morrison responded, "Please tell me you're fucking joking." See id. Morrison asked Macario if he radioed dispatch during the pursuit. See id. at ¶ 24. Macario told Morrison that he did not radio dispatch but turned off his lights and siren when he realized it was not a smart chase. See id. Morrison told Macario that it was RPD's problem and advised Macario not to tell RPD officers that he attempted to stop Decedent Mason. See id. at ¶ 27. Rather, Morrison told Macario to tell RPD that he "drove up on" the accident scene. See id. Morrison asked Macario if he confirmed that Decedent Mason was dead, and Macario replied, "[Y]ea." See id. at ¶ 28. Before hanging up, Morrison told Macario that he "wouldn't say shit" to RPD about the pursuit and reminded Macario to just say he "drove up on" the wreck. Id. at ¶ 29.

After hanging up, Macario approached Decedent Mason's vehicle and inspected the exterior. See id. at ¶ 31. Once RPD arrived on scene, Macario approached the RPD officers and told them that he had "rolled up on" the accident, which was "fatal." Id. at ¶ 33. At 2:36 a.m., an RPD officer asked Macario if he checked on the driver, and Macario responded, "[N]ot yet, no." Id. at ¶ 34. Then a different RPD officer asked Macario if he was "pulling [Decedent Mason] over or something." Id. at ¶ 35. Macario replied "[N]o." Id. at ¶ 36. He explained, "[T]his is just the little area I work and I came up on it and I saw all the smoke and heard all the cars hitting the debris." Id.

Macario's subsequent conduct and statements would not permit a reasonable factfinder to infer that Macario pursued Decedent Mason with the intent to harm him. Morrison directed the cover-up, not Macario. Macario called his supervisor to tell him what happened, and Morrison explicitly told Macario to lie. Thus, Macario lying to RPD about his pursuit is not probative of Macario's subjective state of mind during the pursuit.

Mason emphasizes that Macario did not check on Decedent Mason but proceeded to tell Morrison and RPD that Decedent Mason was dead at the scene. See [D.E. 20] 9. Mason argues that the failure to render aid and false statements create a plausible inference that Macario intended to harm Decedent Mason during the pursuit. See id. If Macario had chased Decedent Mason until he crashed, the court would have to decide whether such facts would be sufficient to survive a motion to dismiss. But Macario stopped his pursuit and lost sight of Decedent Mason before Decedent Mason wrecked. Thus, that Macario said the crash was fatal and did not render aid would not permit a reasonable factfinder to infer that Macario pursued Decedent Mason with the intent to cause him harm.

As for Johnson, Macario used his lights and siren during the pursuit and did not plant evidence or falsify statements that would result in criminal charges if Decedent Mason survived. See 452 F. Supp. 3d at 292 (finding the intent-to-harm standard satisfied when officers chased the suspects without lights or sirens and then planted 32 grams of heroin in the occupants' vehicle after it crashed). The officers' actions in Johnson would permit a reasonable factfinder to conclude that the officers intended to harm the suspect by depriving him of either life or liberty. See id. at 302.

At bottom, the post-crash conduct and statements along with the pre-crash facts do not support an inference that Macario chased Decedent Mason to "induce . . . lawlessness, or to

terrorize, cause harm, or kill." Lewis, 523 U.S. at 855. Because Mason failed to plausibly allege that a substantive due process violation occurred, Macario is entitled to qualified immunity on count one. See Wood, 572 U.S. at 757; Pearson, 555 U.S. at 232; Knibbs, 30 F.4th at 214; Brockington, 637 F.3d at 506; Doe ex rel. Johnson, 597 F.3d at 169. Thus, the court grants Macario's motion to dismiss count one.

Because the court holds that Mason failed to plausibly allege a violation of a constitutional right, the court need not address whether the right at issue was clearly established at the time of Macario's alleged misconduct. See Wood, 572 U.S. at 757; Pearson, 555 U.S. at 232; Knibbs, 30 F.4th at 214; Brockington, 637 F.3d at 506; Doe ex rel. Johnson, 597 F.3d at 169.

III.

In sum, the court GRANTS defendant's motion to dismiss claim one of plaintiff's complaint [D.E. 17]. Defendant did not move to dismiss count two and that count may proceed to discovery.

SO ORDERED. This 13 day of February, 2026.

JAMES C. DEVER III
United States District Judge